In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-06-00212-CR


______________________________




RAYMOND ROSBOROUGH, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 124th Judicial District Court


Gregg County, Texas


Trial Court No. 34487-B




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Chief Justice Morriss



MEMORANDUM OPINION



 In early 2006, an argument involving Raymond Rosborough and Waltrekis (1) Lenoir at the
house of Rosborough's girlfriend, Dionna Green, resulted in Rosborough shooting Lenoir six times
with a pistol. Rosborough claimed he shot Lenoir in self-defense. A Gregg County jury convicted
Rosborough of aggravated assault and assessed punishment at seven and one-half years' confinement
and a $10,000.00 fine, which the trial court imposed. In his only two issues on appeal, Rosborough
asserts that the evidence is legally and factually insufficient to disprove beyond a reasonable doubt
that Rosborough shot Lenoir in self-defense. (2) We find sufficient evidence and affirm the trial court's
judgment.

 In reviewing the legal sufficiency of the evidence, the reviewing court employs the standards
set forth in Jackson v. Virginia, 443 U.S. 307, 319 (1979). This requires us to examine the relevant
evidence in the light most favorable to the verdict and determine whether any rational trier of fact
could have found the essential elements of the crime beyond a reasonable doubt. Johnson v. State,
23 S.W.3d 1, 7 (Tex. Crim. App. 2000). 

 When reviewing a challenge to the factual sufficiency of the evidence supporting the
conviction, we must determine whether, considering all the evidence in a neutral light, the jury was
rationally justified in finding guilt beyond a reasonable doubt or whether the great weight and
preponderance of the evidence contradicts the jury's verdict. Watson v. State, 204 S.W.3d 404, 415,
417 (Tex. Crim. App. 2006); see also Marshall v. State, 210 S.W.3d 618, 625 (Tex. Crim. App.
2006). If the evidence is factually insufficient, then we must reverse the trial court's judgment and
remand the case for a new trial. Watson, 204 S.W.3d at 417; Clewis v. State, 922 S.W.2d 126, 135
(Tex. Crim. App. 1996). Unless the record clearly reveals that a different result is appropriate, we
must defer to the fact-finder's determination concerning the weight to be given to contradictory
testimony. Johnson, 23 S.W.3d at 8.

 Mylice Noel, one of Green's daughters, was the initial witness at the trial and proved to be
key. (3) Mylice listed her nuclear family members who lived at the Green house at the time of the
shooting: Green, Kionna and Brittney (Mylice's two sisters), and Mylice's brother. Mylice also
listed as other residents of the house at the time Lenoir (Brittney's fiancee), Britton (Brittney and
Lenoir's baby), and Rosborough. Mylice stated that the argument between Rosborough and Lenoir
started when Lenoir went into the back bedroom to get the baby, which made Rosborough mad
because he thought Lenoir had no business being in a bedroom there. Before the shooting, Mylice
had not noticed the argument becoming physical, nor involving the display of any weapons. Mylice
stated that, just before the shooting happened, Lenoir was standing with his back to Rosborough 
using the telephone calling Lenoir's sister to give Lenoir a ride away from the house. Mylice
described the sequence of events: Rosborough had retrieved the gun from another part of the house, (4)
taken it into the bathroom where Green was treating her injured nose--suffered a bit earlier--and
told Green that Rosborough had the gun for Lenoir. Then Rosborough shot Lenoir. Mylice never
saw Lenoir lift up his shirt or act like he had a weapon. She also never heard him say he had a
weapon. She was standing at Rosborough's side when he shot Lenoir. She remembers hearing seven
shots. She also stated that Lenoir turned toward Rosborough, saw him, was shot by Rosborough,
dropped the telephone, and dropped to his knees, holding at least one place where he had been shot
and struggling for breath. On further questioning, Mylice said that Rosborough shot Lenoir because
Rosborough was mad that Lenoir had threatened to call someone to come shoot Rosborough if
Rosborough would not stop talking. Mylice indicated that, at the time of the first shot, Lenoir was
not lunging toward Rosborough but was standing up straight, unable to move "like he was in shock
or something." Lenoir fell to his knees about the time of the third shot and stayed down for the
remainder of the shooting, not lunging at or moving toward Rosborough, and without a weapon. 

 Rosborough's counsel pointed out, in later questioning Mylice, that there were discrepancies
concerning Lenoir's physical positioning at the time of the shooting and Rosborough's apparent
motivation for the shooting, when comparing the recording of Mylice's 9-1-1 call in the immediate
aftermath of the shooting, her videotaped statement to police taken later that evening, and her trial
testimony. 

 Kim Fleming, an operating room nurse, testified about Lenoir's medical records generated
after the shooting. Fleming testified to numerous gunshot wounds to Lenoir, some apparently
inflicted to the front of his body and some to the back of his body. 

 Police officer Richard Spruiell testified that, around 7:00 p.m. that evening, he had been
called to the Green house concerning a domestic disturbance. On site at that time, he determined
that, though Rosborough and Lenoir had been arguing, until that time there had been no physical
violence or weapons involved. Spruiell concluded that the matter had been solved and would not
recur. That conclusion proved wrong, as he was called back to the residence approximately two and
one-half hours later, after Lenoir had been shot. Spruiell noted blood on the back of Lenoir's shirt,
but did not notice it elsewhere. He also determined that Lenoir had been shot "a couple of times,"
in the back of the neck and in the back. During Spruiell's earlier visit to the residence, he had not
looked for weapons and had not searched Lenoir for a weapon. 

 Lenoir also testified. Lenoir denied that he was living at the Green house at the time of the
shooting, but admitted that Brittney was a resident. Lenoir testified that he and Rosborough had their
differences and that, though they argued at times, they had never come to violence before the
shooting. Lenoir indicated that he and Rosborough were mad at each other during the evening but
that, before the shooting, there had been no weapons used or threatened and no physical fighting. 
Lenoir admitted that, during the argument earlier that evening, Lenoir was restrained by Brittney
from physically lunging at Rosborough. Lenoir claimed to have had no weapon on him. He said
that, at the time of the later altercation, Lenoir got mad because Rosborough had hit Green in the
nose. Lenoir testified that, after Green was hit in the nose, Brittney restrained Lenoir; then Lenoir
made the telephone call to his sister to come get him.

 Lenoir then was questioned about the shooting. He said, while using the telephone, he was
seated on the floor. His first notice of the shooting was when two shots hit near him. The next three
shots hit him: the first in the back of the neck by his ear, the second in his back, and the third in his
side. In open court, Lenoir pointed out each of the places where six bullets hit him. The shots were
fired in rapid succession. During the shooting, Lenoir started to move away from Rosborough. 

 On cross-examination, Lenoir denied making any threat to Rosborough that evening,
specifically denying the allegation that he had threatened to call "Spence" to come shoot
Rosborough. Lenoir also stated that, at the time the shooting began, Lenoir was talking on the
telephone facing a wall. He acknowledged that, earlier, he had tried to jump on Rosborough and
threatened to "kick [Rosborough's] ass" after Rosborough had hit Green in the nose. Lenoir also
acknowledged that, given his poor memory about what had happened two hours earlier, if others said
Lenoir was threatening and lunging at Rosborough at that earlier time, it might have happened then,
too. He further acknowledged that, at some time during the evening, while angry, Lenoir wanted to
physically fight Rosborough and was verbally encouraging such a fight. 

 Finally, Lenoir was asked to, and did, show the jury at close range the two scars on the back
of his neck where bullets entered. 

 Police officer Christopher Byrdsong, one of the officers who responded to the report of a
shooting that night, testified that Mylice had quoted Rosborough as saying to her just before the
shooting, "I've got something for you." Byrdsong's original report, which he agreed with on cross-examination, indicated that, before the shooting, Green was cleaning the bathroom and that the "head
butt" injuring her nose occurred after the shooting. 

 When police detective Kirk Haddix testified, he displayed to the jury three items of clothing
Lenoir had been wearing at the time of the shooting: sweatpants, an outer shirt, and a tank top. In
displaying each item, he identified holes, apparently bullet holes, all located in the rear of each item. 

 Green testified that Rosborough and Lenoir argued loudly that evening. By the time the
police first arrived at her house that evening, Green had seen no physical altercation between the two
men, nor any weapons. At the time of the shooting, Green was in the bathroom because she had
been "head butted" in the nose, which had split her nose open. She recounted that Lenoir was calling
on the telephone to get a ride away from the house. She indicated she did not hear Rosborough say,
"I got something for him." 

 The above includes evidence which, if believed by the jury, supports the finding that the
shooting was not in self-defense; the contrary evidence is not so strong or overwhelming that the
great weight and preponderance of the evidence contradicts the jury's verdict. The jury's function
is to resolve any conflicts in the evidence. See Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon
1979); Johnson, 23 S.W.3d at 9. Because the jury is in the best position to evaluate the credibility
of the witnesses and the weight of the evidence, we give due deference to its determination. See
Marshall, 210 S.W.3d at 625. (5) The jury was free to accept or reject any and all of the evidence
presented by either side. See Wesbrook v. State, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). It
resolved the evidence in favor of a finding of guilt.

 We conclude the evidence is legally and factually sufficient to support Rosborough's
conviction for aggravated assault, because it supports a finding against Rosborough's claim that he
shot Lenoir in self-defense. See Watson, 204 S.W.3d at 415; Lane v. State, 151 S.W.3d 188, 191-92
(Tex. Crim. App. 2004); Tear v. State, 74 S.W.3d 555, 560 (Tex. App.--Dallas 2002, pet. ref'd).

 For the reasons stated, we affirm the trial court's judgment.



 Josh R. Morriss, III

 Chief Justice


Date Submitted: July 6, 2007

Date Decided: July 17, 2007


Do Not Publish
1. Lenoir is sometimes referred to as Walter.
2. In approaching Rosborough's assertions on appeal, we note that he offers no particular
argument on why the evidence is insufficient, but merely makes the global assertion that the evidence
is insufficient to disprove self-defense. Our review of the evidence is directed toward evidence
relevant to the issue of self-defense.
3. No less than five notes from the jury to the trial court, generated during guilt/innocence
deliberations--the only testimony-focused communications from the jury during those
deliberations--make clear the jury's central interest in what Mylice testified to concerning self-defense. 
4. In other testimony, it was established that Green kept the pistol, unloaded, under her mattress
and kept the ammunition for it in her bedside table.
5. It is not enough for us to harbor a subjective level of reasonable doubt to overturn a
conviction that is founded on legally sufficient evidence. We are not entitled to conclude that a
conviction is "clearly wrong" or "manifestly unjust" simply because, on the evidence in the record,
we would have acquitted had we been the jury. Nor can we declare that a conflict in the evidence
justifies a new trial simply because we disagree with the jury's resolution of that conflict. See
Watson, 204 S.W.3d at 417.